# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IMPORTERS SERVICE         :
CORPORATION,              :
                                  :
         Plaintiff,         :
                                  :     CIVIL ACTION NO.
      v.                          :     1:07-CV-0745-JOF
                                  :
GP CHEMICALS EQUITY, LLC,    :
                                  :
         Defendant.       :

## OPINION AND ORDER

This matter is before the court on Defendant's motion for summary judgment [56];

Defendant's motion for leave to file excess pages [82]; and Plaintiff's motion to strike [86].

## I.      Background

### A.      Procedural History and Facts

Plaintiff, Importers Service Corporation, filed suit against Defendant, Georgia-Pacific

Resins, Inc., on April 2, 2007, alleging state law claims of breach of contract, fraud, and

unjust enrichment, as well as a violation of Georgia's Fair Business Practices Act, and

federal claims under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).  Georgia-Pacific Resins,

Inc., had changed its name to GP Chemicals Equity, LLC, and the complaint was amended

by consent to reflect the proper name. Defendant also filed a counterclaim for breach of contract and negligent misrepresentation.

The parties' dispute revolves around the product known as NovaRes 1190 which is used as a densifying agent in the compounding of citrus beverages. In other words, it assists in keeping flavoring oils in suspension in beverages. Because Defendant had never marketed a product like NovaRes to the beverage and food industry, in 2000, it began discussions with Plaintiff to assist Defendant with the selling, marketing, and promoting of NovaRes. Prior to entering into an agreement, Plaintiff worked with its customers to determine if NovaRes was a viable product, developed a marketing plan, and gained regulatory approval for NovaRes. Plaintiff also tested the efficacy of the product and made adjustments to the product's formulation.

The parties entered into a Distributor's Agreement on March 10, 2003. That Agreement is central to the parties' dispute. The Agreement sets forth the responsibilities of Plaintiff which generally relate to identifying, contacting, and soliciting customers. *See* Agreement, ¶¶ 3-4, 10. At some point in 2003, Plaintiff asserts that Defendant was not able to provide it with sufficient quantity of quality NovaRes product. Plaintiff asserts this caused a delay in entry into the market. Plaintiff contends it was unable to fill an order for 10,000 pounds of NovaRes from a customer during this time, so the order was cancelled. Plaintiff also states it was not able to fill an order from Shasta, a large beverage distributor.

AO 72A
(Rev.8/82)

Plaintiff asserts it had approximately fifty other customers to whom it was not able to provide samples of NovaRes. Some of the NovaRes provided by Defendant to Plaintiff in 2003 had unacceptable odors, black specks, and dusting. Defendant was also forced to correct a packaging problem in 2003. Defendant met with two customers without bringing along Plaintiff. Plaintiff asserts that this negatively affected Plaintiff's ability to market NovaRes, undermined its credibility, and dissuaded customers from purchasing product. In 2005, Defendant delayed in filling out paperwork that had to be completed before Plaintiff could complete a sale to a significant customer.

The Agreement stated that Defendant "may terminate this Agreement forthwith by notice to ISC . . . if ISC fails to meet the quantity thresholds for purchases and sales of [NovaRes] set forth in Exhibit E." *See* Agreement, ¶ 14(g). Exhibit E to the Agreement defines "quantity thresholds" as follows:

> The first 12 months after the Effective Date: 150,000 pounds of Product per calendar quarter purchased and paid for by Qualified Customers.
> Months 13 through end of the terms of the Agreement [sic] 250,000 pounds of Product per calendar quarter purchased and paid for by Qualified Customers.

*Id.*, Exh. E. The Effective Date of the Agreement is defined as:

> [T]he earlier to occur of (1) the date ISC has sold One Hundred Fifty Thousand (150,000) pounds or more of [NovaRes] to Qualified Purchasers in any twelve (12) month period; or (2) the date which is 24 months from the date [NovaRes] receives GRAS certification and/or Food and Drug Administration approval for use in the Market.

3

*Id.*, ¶ 1.

ISC never sold 150,000 pounds of NovaRes during any twelve-month period. The other trigger of the Effective Date requires more discussion. With respect to determining when NovaRes was "certified" GRAS or Generally Recognized As Safe by the Flavor and Extract Manufacturers Association ("FEMA") of the United States, both parties focus on the deposition of John B. Hallagan, Legal Advisor to FEMA. The court takes the time to highlight portions of Mr. Hallagan's deposition since neither party considers the full extent of his testimony. For the purposes of context only, the court notes that the GRAS program is part of the Federal Food, Drug, and Cosmetics Act. It exempts from the statutory category "food additives" certain substances that are "generally recognized" by experts as having been demonstrated to be safe under conditions of intended use. The benefit of receiving GRAS certification is that if a substance is not classified as a "food additive," it does not need to have premarket approval from the Food & Drug Administration. FEMA's expert panel is a group of experts with authorization to add substantives to the GRAS list. FEMA, itself, consists of more than 100 companies that manufacture or use flavors.

Mr. Hallagan testified that Plaintiff first applied for GRAS status around 2002 or 2003. *See* Hallagan Depo., at 7. He stated that the scientific staff of FEMA generally works with applicants in a "pre-submission" process to help them develop the applications. *Id.* Once the application is completed, it is submitted to FEMA's expert panel for evaluation of

4

whether the product will be "generally recognized as safe." *Id.* The scientific director of FEMA provides a letter to the applicant informing it of the panel's decision. *Id.* at 8. Mr. Hallagan recalls that NovaRes was considered by the expert panel in 2002 and placed on hold at that time. *Id.* The panel then reviewed NovaRes in February 2003 and it was "determined to be GRAS." *Id.* at 8-9. He believed the letter stating that NovaRes has been granted GRAS approval was dated April 2003, but agreed that an exhibit showing the date was actually March 17, 2003, would be more accurate. *Id.* at 10-12.

Numerous modifications were made to that original letter at the request of Plaintiff and FEMA mailed out three additional letters, but those modifications do not "change the fact that the product received FEMA GRAS approval at the February 2003 meeting of the expert panel." *Id.* at 13. "The changes made [in the letter] were considered clarifications that do not affect the GRAS evaluation of the material. So the material was determined to be GRAS at the February '03 meeting." *Id.* at 15, 18. Even though these subsequent letters were issued, "[t]he product remained FEMA GRAS from February '03 and remains FEMA GRAS today." *Id.* at 18. Mr. Hallagan testified that the letters specified the "intended use" for the substance and that it was unusual to have more than one letter issued. *Id.* at 39.

In August 2005, the 22nd publication of the FEMA Expert Panel came out in the journal *Food Technology* with NovaRes listed as GRAS. *Id.* at 49. Roughly every two years, FEMA publishes a list of substances it has recognized as GRAS. *Id.* at 51. In

AO 72A
(Rev.8/82)

preparation for the publication, a substance receives a FEMA GRAS number. *Id.* at 52. Mr. Hallagan could not recall when NovaRes received its number, but it could have been between several months or weeks before publication. *Id.* Prior to publication, a list of the substances is given to the Food & Drug Administration so that it can offer any opinion that it wishes. *Id.* at 53.

Mr. Hallagan further testified that the purpose of publishing the list in a journal was to comply with the statutory requirements of GRAS status which "include general recognition, and there's case law which goes back many years which shows that you can't have general recognition if nobody knows about the material." *Id.* at 55. The publication of the material allows the public, regulators, or anyone else an opportunity to see what has been determined to be GRAS and express objections or concerns. *Id.* There is no set publication date. FEMA typically waits until there is sufficient volume to justify publication. Time between publication can be as little as two years or as great as four to five years. *Id.* at 57. "But, obviously, within that time frame, the time varies for individual substances depending on when they were GRAS'd. So you could have one that was GRAS'd at the beginning of the interval, which has a longer period, and one at the end, which has a shorter period." *Id.* He then testified that if "a party were to make a judgment that something is GRAS, but then there's no publication or notification of it, no description

6

of its condition or intended use, my opinion would be that the material is not, in fact, GRAS, because there's no general recognition." *Id.* at 62. Mr. Hallagan went on to state:

> Q:    Between the time that the product receives FEMA GRAS granted by the expert panel and the publication of the letter, is the product considered GRAS?
> A:    Yes, it is.
>       MR. ELY:    Objection to the form of the question.
> Q:    (By Ms. Ludlam) And so the publication of the GRAS list is merely public notification of that GRAS status, correct?
> A:    That's one way to look at it, yes. It's – It's acknowledgment in the publicly available literature that these materials have been determined to be GRAS by the expert panel.

*Id.* at 76. "The substance is GRAS upon the expert panel making that determination." *Id.* at 77.

Mr. Hallagan agreed that FEMA does not use the term "certification of GRAS." *Id.* at 79. Rather, the organization uses the term "determination." *Id.* at 80. According to Mr. Hallagan, NovaRes could be "legally sold as GRAS upon determination by the expert panel that the product is GRAS." *Id.* at 82. ISC, itself, promoted and marketed NovaRes as GRAS from February 2003.

From March 10, 2003 until March 13, 2006, Plaintiff never sold 150,000 pounds of NovaRes during any calendar quarter. Under the terms of the Agreement, within the time period of twelve months after the Effective Date of the Agreement, Defendant may terminate if Plaintiff fails to sell 150,000 pounds of NovaRes during any calendar quarter.

AO 72A
(Rev.8/82)

On November 18, 2005, Defendant sent Plaintiff a letter stating that it was "hereby terminating the term of the Distribution Agreement pursuant to Section 14(g) thereof."

Communications continued between the parties from November 18, 2005 through March 13, 2006 when Defendant sent a final notice of termination to Plaintiff. The termination provisions of the Agreement state:

> (d)   GP[] shall have no obligation to repurchase or credit ISC for its inventory of the Products at the time of termination of this Agreement. GP[] may at its option repurchase from ISC at GP[]'s then current list prices less any applicable then current discounts or net prices paid by ISC, whichever are lower, any and all inventory of Products originally purchased by ISC from GP[] and remaining unsold by ISC.
>
> (e)   GP[]'s repurchase of ISC's inventory of Products or ISC's right to sell such inventory if not so repurchased by GP[] shall constitute ISC's sole remedy for the termination or nonrenewal of this Agreement and shall be in lieu of all other claims that ISC may have against GP[] as a result thereof. Under no circumstances shall GP[] be liable to ISC by reason of termination or nonrenewal of this Agreement for compensation, reimbursement or damages.

Agreement, ¶¶ 16(d)-(e).

Paragraph 26 of the Agreement states:

> Notwithstanding any other provision of this agreement, UNDER NO CIRCUMSTANCES SHALL GP[] OR ISC BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES.

*Id.*, ¶ 26 (emphasis in original).

AO 72A
(Rev.8/82)

After the termination of the Agreement, Defendant repurchased the NovaRes inventory in Plaintiff's possession. Plaintiff was paid $137,505.99 for the work and services it provided under the Agreement. Plaintiff has not rescinded the Agreement. Every month between September 11, 2003 and March 2, 2006, Plaintiff sold NovaRes to customers in the beverage and flavor industry for an accumulation of 128,650 pounds sold.

Prior to entering into the Agreement, Plaintiff used its contacts in the beverage industry to have potential customers test NovaRes, poll the market to determine interest in NovaRes, and send samples of NovaRes to potential customers. Plaintiff performed these pre-contractual efforts to assess the market and determine whether to proceed in a relationship with Defendant. These pre-contractual tests were performed by potential customers free of charge to Plaintiff, although Plaintiff's representatives testified that they cannot now ask this "favor" of the same customers in the future.

During the negotiation of the Agreement, Plaintiff and Defendant engaged in discussions concerning Defendant's right to contact potential customers. Defendant sent a fax to Plaintiff during these discussions which states:

> [ISC Statement:] ISC objects to contacts being made without our prior approval and right to participate. This should be rewritten to indicate the need for our approval and right to attend such meetings also that contact should only be made by qualified GPAC technical support personnel and not sales staff. Language can be included to indicate that ISC will not object to joint contacts made to determine the status of a company as a Qualified Purchaser provided GPAC has given ISC opportunity to clarify any issues without GPAC intervention. [GP Response:] I CAN'T AGREE TO THIS. I HAVE

9

> NO INTENTION OF HAVING OUR SALES PEOPLE CONTACT THESE
> CUSTOMERS BUT AS THE MANUFACTURER I HAVE TO BE ABLE
> TO RESPOND TO CUSTOMER REQUESTS, PROVIDE TECHNICAL
> INFORMATION AS NEEDED, AND HAVE THE RIGHT TO VISIT THE
> CUSTOMERS IF THERE IS AN EMERGENCY. WE CAN'T WAIT TO
> MERGE SCHEDULES IF THERE ARE ISSUES. I EXPECT ISC TO TRY
> AND HANDLE ALL ISSUES IF POSSIBLE AND KEEP GP WELL
> INFORMED. GP HAS TO HAVE THE RIGHT TO CONTACT THESE
> CUSTOMERS IF THERE IS A PROBLEM.

*See* Facsimile ISC0004216.

These negotiations were resolved with the final Agreement providing:

> [ISC will] work diligently to establish and maintain sales of the Products in
> the Market throughout the Territory and to have its salespersons personally
> contact the Qualified Purchasers at reasonable intervals to promote and sell
> them the Products, in each case, without prejudice to the right of GP[] to make
> such contacts independently from or jointly with ISC sales personnel.

*See* Agreement ¶ 4(c). Defendant named Plaintiff an "exclusive distributor" of NovaRes in

a defined territory. *Id.*, ¶ 2(a) (Defendant "appoints ISC as its exclusive distributor, of the

Products in the Market only and in the Territory only").

The Agreement contains a merger clause which provides:

> This Agreement and the Confidentiality Agreement constitute the entire
> agreement between the parties hereto with respect to the subject matter hereof
> and cancels and supersedes any prior understanding or agreement between the
> parties hereto with respect to the subject matter hereof. There are no
> representations, warranties, terms, conditions, undertakings or collateral
> agreements, express, implied or statutory, between the parties other than as set
> forth in this Agreement.

*See* Agreement, ¶ 22.

On December 5, 2005, after Defendant terminated the Agreement with Plaintiff, Defendant sent a letter to certain customers who purchased NovaRes notifying them that the Agreement with Plaintiff had been terminated, but that NovaRes would still be available and Defendant remained committed to the product. The letter stated that Defendant would be making follow-up contacts with them. Mike Roberts, a representative of Defendant, also made telephone calls to NovaRes customers telling them that the Agreement was terminated, but that Defendant would continue to supply NovaRes. Customers were required to fill out a credit application provided by Defendant and provide "ship to" and "bill to" information to Defendant's staff.

For a period of time after the termination of the Agreement, between March 20, 2006, and October 30, 2006, Defendant sold bags of NovaRes that contained Plaintiff's name and logo on the bottom of the back of a fifty-pound bag. The bags also contained Defendant's trademarks and logos. Defendant made seventeen sales of NovaRes to seven customers, and the average order placed in this period was for approximately 4,000 pounds (or eighty-one fifty-pound bags) of NovaRes with an average price of $12,781.00. When shipped, NovaRes bags are stacked vertically in stiff cardboard boxes with tops, placed on large pallets and wrapped in plastic for shipment. For those boxes shipped by Defendant, only the Georgia Pacific logo appears on the outside of the boxes. Plaintiff sent Defendant a cease and desist letter on September 7, 2006.

11

## B.    Contentions

Defendant argues that Plaintiff's breach of contract claim fails because Defendant properly terminated the Agreement due to Plaintiff's failure to meet certain sales thresholds in the Agreement. In any event, Defendant contends, Plaintiff's remedies under the Agreement are limited to selling its remaining inventory of NovaRes. Defendant further contends that Plaintiff cannot maintain a claim for quantum meruit because there is an express contract between the parties and Plaintiff has not treated that contract as rescinded, Plaintiff was fully compensated for its performance, and Plaintiff cannot demonstrate impossibility of performance. Because there is an express contract between the parties and Plaintiff did not provide additional services with an expectation of receiving compensation, Defendant also avers that Plaintiff's unjust enrichment claim fails. Under the terms of the Agreement, Defendant was permitted to contact customers directly; therefore, Defendant contends, it cannot be liable for Plaintiff's fraud claim. Further, because the Agreement contains a merger clause, Plaintiff cannot demonstrate the justifiable reliance necessary for a fraud claim. Finally, Defendant argues that Plaintiff cannot show the likelihood of confusion necessary to survive summary judgment on its claim under the Lanham Act.

Plaintiff responds that the court cannot grant Defendant's motion for summary judgment on the breach of contract claim because there is a dispute of fact as to the "effective date" of the Agreement which impacts a determination of whether Plaintiff met

AO 72A
(Rev.8/82)

quantity requirements under the Agreement. Plaintiff further states that if Defendant prematurely breached the Agreement, as Plaintiff believes it did, Plaintiff's remedies under the contract are not limited to sale of remaining product. Plaintiff also contends that it may raise a claim for quantum meruit even in the face of an express agreement between the parties where it alleges that its performance under the contract was "impossible." Plaintiff responds that until trial, it is able to pursue alternative theories of breach of contract and unjust enrichment. Further, for those services Plaintiff alleges it provided outside of the contract, a claim for unjust enrichment is not barred. Moreover, Plaintiff avers that it is an open question whether "expectation of compensation" is an element of unjust enrichment under Georgia law. Plaintiff contends that its fraud claim survives the merger clause of the Agreement because it bases its claim on the contract's use of the term "exclusive distributor" which Defendant never intended to honor. Finally, Plaintiff avers that the court should not grant Defendant's motion for summary judgment on Plaintiff's Lanham Act claim because it is logical that Plaintiff can demonstrate the likelihood of confusion where Defendant sold NovaRes product that was labeled with Plaintiff's trademark and logo.

In its response to Defendant's motion for summary judgment, Plaintiff abandons its claim under the Georgia Fair Business Practice Act. Therefore, the court grants Defendant's motion for summary judgment on that claim.

13

## II.    Discussion

### A.    Plaintiff's Motion to Strike

In its reply brief, Defendant argues that Plaintiff cannot sustain its breach of contract and quantum meruit claims because the acts of which it complains took place between 2003 and 2005, and the Agreement contains a one-year statute of limitations period.   After Defendant filed its reply brief, Plaintiff filed the instant motion asking the court to strike the new statute of limitations argument because it was not raised in Defendant's moving papers, or in the alternative, granting Plaintiff leave to file a sur-reply to address the argument. Defendant responds that it did not raise the statute of limitations argument until its reply brief because the actions which Plaintiff alleges caused the impossibility were "new evidence."

The court finds that although Defendant listed statute of limitations as one of its defenses in its answers, it did not make that argument in its motion for summary judgment. Generally, issues not raised in the initial brief are deemed abandoned. *See*, *e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001).  Defendant asks the court to excuse its failure to raise the statute of limitations issue in its initial brief because the facts upon which Plaintiff relied for its impossibility defense were "new evidence."   The court finds that each of the facts upon which Plaintiff bases its argument was adduced through the discovery process and therefore cannot be considered "new evidence" that was only brought

forward during the briefing stage. As such, Defendant had before it the facts Plaintiff relies

on and Defendant is not excused from raising the statute of limitations in its initial briefing.

The court GRANTS Plaintiff's motion to strike [86].

### B. Breach of Contract

Plaintiff alleges that Defendant breached the contract because Defendant did not have

proper grounds under the terms of the Agreement to terminate the contract. The party

claiming breach of contract has the burden of pleading and proving (1) the subject matter

of the contract, (2) consideration, and (3) mutual assent by the parties to all of the contract

terms. *See* O.C.G.A. § 13-3-1; *Broughton v. Johnson*, 247 Ga. App. 819, 819 (2001). Once

such a contract is shown, the elements of a right to recover for the breach of said contract

are (1) the breach and (2) "the resultant damages to the party who has the right to complain

about the contract being broken." *Budget Rent-A-Car of Atlanta, Inc. v. Webb*, 220 Ga. App.

278, 279 (1996) (quoting *Graham Bros. Constr. Co. v. C. W. Matthews Contracting Co.*,

159 Ga. App. 546, 550 (1981)).

As the court set forth above, under the terms of the Agreement, Defendant can

terminate the contract if ISC fails to meet certain quantity thresholds at two stages of the

Agreement – the first twelve months after the Effective Date and from month thirteen to the

end of the Agreement. Defendant's position is that the Effective Date of the Agreement was

February 2005, and between February 2005 and November 2005 when Defendant sent the

termination letter, Plaintiff failed to sell 150,000 pounds of NovaRes in any calendar quarter. Plaintiff contests that the Effective Date of the Agreement was February 2005.

Under the terms of the Agreement, the Effective Date is the earlier of (1) the date when ISC has sold 150,000 pounds of NovaRes in any twelve month period or (2) twenty-four months from the date NovaRes receives GRAS certification. All parties agree that Plaintiff never sold 150,000 pounds of NovaRes during any twelve-month period, so that event could not have triggered the Effective Date. With respect to the GRAS trigger, Plaintiff argues that there is a dispute of fact as to the date NovaRes received GRAS certification and it could have been any of six potential dates: February 2003, the date the FEMA expert panel determined NovaRes to be GRAS; March 17, 2003, the date the first FEMA letter was sent; April 23, 2003, the date of the second FEMA letter; February 2005, the date of the third FEMA letter; March 9, 2005, the date of the fourth FEMA letter; or August 2005, the date of publication of the GRAS list in *Food Technology*.

Both parties have cited to Mr. Hallagan's deposition testimony to support their arguments concerning the GRAS issue. As the court indicated above, Mr. Hallagan testified extensively on this issue. The court first rejects Plaintiff's argument that NovaRes never received GRAS "certification" as specified in the Agreement. While it is true that Mr. Hallagan testified that FEMA uses the term "determination" as opposed to "certification,"

16

reading the plain language of the contract clearly indicates that GRAS determination is the operative fact.

Plaintiff also argues that NovaRes could not have been determined to be GRAS until August 2005 when it was published in *Food Technology* because part of the significance of GRAS is that something be "generally recognized" as safe. Mr. Hallagan's deposition testimony lends some support for this position, however, the precise question before the court is when the second possible Effective Date in the Agreement was triggered. The Agreement states: "24 months from the date [NovaRes] receives GRAS certification and/or Food and Drug Administration approval for use in the Market."

Mr. Hallagan repeatedly testified that a substance received GRAS certification when that status is granted by the expert panel. There is no dispute that this event happened in February 2003. He stated that NovaRes was GRAS from the date of the meeting in February 2003 and continues to be so. It is true that "general recognition" is part of that determination, but the expert panel makes that determination. The expert panel stated that as of February 2003, the product was generally recognized as safe. Further, both Plaintiff and Defendant took contemporaneous actions which indicated they believed the substance to have received GRAS determination as of February 2003. Plaintiff, itself, marketed NovaRes as GRAS from February 2003.

The fact that FEMA issued four separate letters does not alter the determination date. Mr. Hallagan specifically testified that the issuance of the letters relates to the potential uses of the product and has no impact on GRAS determination. A review of the letters themselves and Mr. Hallagan's testimony concerning them shows that Plaintiff asked FEMA to reissue the letter as a means of reassuring potential customers that the FEMA panel had given GRAS approval to NovaRes under the circumstances the customer would use the product. Therefore, the court determines that no reasonable jury could conclude other than February 2003 for the date of GRAS certification, meaning that the Effective Date of the Agreement was twenty-four months later, or February 2005.

Defendant contends that Plaintiff failed to meet the 150,000 pounds quantity threshold in any calendar quarter thereafter and therefore Defendant properly terminated the contract. Plaintiff responds that Defendant's actions made it impossible for Plaintiff to sell NovaRes. Specifically, Plaintiff points to testimony that: (1) Defendant failed to provide commercially salable NovaRes from February 2003 through December 2003; (2) Defendant failed to provide NovaRes to fill orders placed by GSB and Shasta; (3) Defendant provided NovaRes that had unacceptable odors, black specks, and dusting; (4) Defendant provided NovaRes in defective packaging; (5) NovaRes scheduled meetings with potential customers without ISC; (6) Defendant refused to complete customer paperwork; and (7) Defendant prohibited ISC from selling or marketing NovaRes after November 2005.

"Where a contract provides for performance of an obligation, the party bound to perform the obligation may be relieved and the obligation waived, where the other party to the contract repudiates the obligation by act or word, or takes a position which renders performance of the obligation useless or impossible." *Taliafaro, Inc. v. Rose*, 220 Ga. App. 249 (1996) (citing *Stokes v. Walker*, 131 Ga. App. 550, 552 (1974), and O.C.G.A. § 13-4-23). Thus, it is theoretically possible to create a question of fact for the jury on impossibility. However, here, each of the incidents pointed to by Plaintiff occurred in 2003, prior to the Effective Date of the Agreement, thus having no impact on whether Plaintiff was able to sell the required quantity after February 2005. (The prohibition of sales after November 2005 is not relevant to an impossibility claim because that occurred after Defendant terminated the Agreement.). Furthermore, Plaintiff was able to sell 128,650 pounds of NovaRes to customers from September 2003 through March 2006, defeating an argument that sale of NovaRes was impossible. Therefore, the court finds that Defendant properly terminated the Agreement.

In the alternative, Defendant argues that in the event of a termination, the Agreement limits the parties' remedies to Defendant repurchasing the NovaRes from Plaintiff if no third party does so. Therefore, Defendant argues, Plaintiff has no other remedy for its breach of contract claim. Plaintiff responds that because Defendant improperly terminated the contract, the remedies limitation section in the contract does not apply.

As set forth above, the Agreement provides that after termination, Defendant may repurchase NovaRes from Plaintiff and that Defendant's repurchase of the product and Plaintiff's right to sell NovaRes "shall constitute ISC's sole remedy for the termination or nonrenewal of this Agreement and shall be in lieu of all other claims that ISC may have against GP[] as a result thereof. Under no circumstances shall GP[] be liable to ISC by reason of termination or nonrenewal of this Agreement for compensation, reimbursement or damages." Agreement, ¶¶ 16(d)-(e).

The court agrees with Defendant that these provisions limit remedies for termination under the contract to the repurchase option or Plaintiff's right to sell. Because the court above found that Defendant properly terminated the Agreement, there is no reason that Paragraph 16 would not apply. For these foregoing reasons, the court GRANTS Defendant's motion for summary judgment on Plaintiff's breach of contract claim.

## C.    Quantum Meruit

Defendant argues that Plaintiff's quantum meruit claim fails because an express contract governs the relationship of the parties, Plaintiff has not treated that contract as rescinded, and Plaintiff has not shown that performance was impossible. Plaintiff responds that the existence of an express agreement does not preclude a quantum meruit claim where issues of impossibility arise.

AO 72A
(Rev.8/82)

Generally, a party cannot raise a claim for quantum meruit where an express agreement exists governing the parties' relationship. *See*, *e.g.*, *Kwickie/Flash Foods, Inc. v. Lakeside Petroleum, Inc.*, 246 Ga. App. 729, 730 (2000); *B&R Realty, Inc. v. Carroll*, 245 Ga. App. 44 (2000). While a party may raise alternative theories on breach of contract and quantum meruit at the pleading stage, once the court has determined that a valid contract governed the parties' relationship, that generally precludes a quantum meruit claim. *Id.* Plaintiff, however, argues that an exception to this rule exists and that a party may maintain both claims if "issues of impossibility" arise, citing *Weathercraft Co. v. Byrd*, 32 Ga. App. 369 (1924).

The court finds this argument unpersuasive. In *Weathercraft*, the plaintiff and defendant entered into a contract whereby plaintiff was to roof defendant's building. The plaintiff alleged that he began work but was not able to complete the job due to actions by the defendant. The court held:

> A party to a contract who has partly performed his obligations thereunder by rendering valuable services may, where it appears that the opposite party has repudiated and abandoned the contract, or has prevented the former from further performance, waive his right to recover for a breach of the contract, and, by treating the contract as rescinded, maintain an action in quantum meruit against the other contracting party for the value of the services rendered.

32 Ga. App. at 369. The parties' relationship is governed by an express contract. Furthermore, in addition to the fact that Plaintiff never treated the contract as rescinded, the

21

court has ruled above that Plaintiff's impossibility theory is not viable under the facts of the case. For these reasons, the court GRANTS Defendant's motion for summary judgment on Plaintiff's quantum meruit claim.

### D. Unjust Enrichment

Similarly, Defendant argues that Plaintiff's unjust enrichment claim fails because the parties' relationship was governed by a valid contract and Plaintiff did not expect to receive compensation when it provided pre-contractual services alleged in its unjust enrichment claim. Plaintiff responds that it may raise an unjust enrichment claim for the pre-contractual services it performed, such as obtaining market data and information on customer requirements and assisting in obtaining regulatory approval for NovaRes and for other work that it performed during the term of the contract. Plaintiff further avers that it performed these services expecting to receive compensation.

"The theory of unjust enrichment applies when as a matter of fact there is no legal contract . . . , but where the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for." *Zampatti v. Trademark International Franchising Corp.*, 235 Ga. App. 333, 340 (1998). Therefore, a claim for unjust enrichment cannot succeed where there is a legal contract between the parties. *Regional Pacesetters, Inc. v. Halpern Enterprises, Inc.*,

AO 72A
(Rev.8/82)

165 Ga. App. 777, 782 (1983).  Thus, the court rejects any aspect of Plaintiff's unjust enrichment claim regarding services it rendered to Defendant during the term of the contract.

Plaintiff is correct, however, that the pre-contractual services it performed would not, by definition, fall within the parties' contract.  The court finds the context of this work is important in determining whether Plaintiff, equitably, should be compensated for it.  The parties have pointed the court to no Georgia cases addressing circumstances like those faced here where Defendant had a product that Plaintiff wanted to assist in bringing to the market. Plaintiff did perform marketing tests and follow the product through the regulatory process. At the conclusion of those efforts, Plaintiff received what it was interested in – a distributorship agreement.  Thus, the work was performed for the benefit of both Plaintiff and Defendant.  If Plaintiff had not wanted to be part of the distributor network for NovaRes, it simply would not have helped test market and gain regulatory approval for the product.  The court does not view those benefits as unjustly conferred upon Defendant.

The court finds *Burton Imaging Group v. Toys "R" Us, Inc.*, 502 F. Supp. 2d 434, 440-41 (E.D. Pa. 2007), and *Dunnaville v. McCormick & Co., Inc.*, 21 F. Supp. 2d 527, 535 (D. Md. 1998), cited by Defendant, to be instructive.  In *Burton*, the plaintiff spent hundreds of hours working on a proposal, going so far as leasing space and subcontracting with another firm in anticipation of obtaining a contract.  The court found that there was nothing "unjust" about the retention of those benefits as they were "merely preparatory to

23

performance." *Id.* at 441 (quotation and citation omitted). In *Dunnaville*, the plaintiff was considering purchasing a subsidiary corporation of defendant. The plaintiff believed the parties had a deal for the purchase and worked to prevent the subsidiary from losing out to a competitor on an exclusive buying arrangement. When the defendant sold the subsidiary to another purchaser, the plaintiff sued for unjust enrichment contending that it had conferred a benefit on the subsidiary by assuring it was not locked out of the buying arrangement. The court held that an unjust enrichment claim would not lie where the plaintiff performed "preliminary services" to increase its chances of obtaining a contract. *Id.* The plaintiff had performed the work out of its own interest in assuring that the assets of the subsidiary it intended to purchase were maintained. *Id.* at 535-36. *See also North American Financial Group, Ltd. v. S.M.R. Enterprises, Inc.*, 583 F. Supp. 691, 700 (N.D. Ill. 1984) ("[w]here preliminary services are conferred for business reasons, without the anticipation that reimbursement will directly result, but rather with the expectation of obtaining a hoped-for contract and incidental to continuing negotiations therefore, quasi-contractual relief is unwarranted").

The court does not agree with Plaintiff that these cases are distinguishable because they involved competitive bidding processes. Plaintiff, here, undertook marketing and regulatory efforts in hopes of working with Defendant to distribute a successful product. Plaintiff had much to gain from its own work. Furthermore, when Plaintiff entered into the

24

Agreement with Defendant, that Agreement contained a merger clause. Had Plaintiff wanted to rely on its previous performance or be compensated for that performance, the time to do so was in the contract. The circumstances of Plaintiff's pre-contractual work here do not result in a benefit inequitably bestowed upon Defendant. For these reasons, the court GRANTS Defendant's motion for summary judgment on Plaintiff's unjust enrichment claim.

### E.    Fraud

Plaintiff alleges that Defendant "falsely represented to ISC that they would work closely together to develop, market, and promote NovaRes 1190 and that it would not alone solicit customers from the Territory." *See* Am. Compl., ¶ 38. Plaintiff's representatives testified that Defendant told them during the course of negotiations that it "would not alone solicit customers." As the court described above, the parties specifically addressed this issue while negotiating the contract. The fax sent by Defendant to Plaintiff specifically states that Defendant would not agree to terms which barred customer contacts being made by Defendant without Plaintiff's approval. *See* Facsimile ISC0004216 (stating "GP HAS TO HAVE THE RIGHT TO CONTACT THESE CUSTOMERS IF THERE IS A PROBLEM.").

These negotiations were resolved with the final Agreement providing:

[ISC will] work diligently to establish and maintain sales of the Products in the Market throughout the Territory and to have its salespersons personally

contact the Qualified Purchasers at reasonable intervals to promote and sell them the Products, in each case, without prejudice to the right of GP[] to make such contacts independently from or jointly with ISC sales personnel.

*See* Agreement ¶ 4(c). Defendant named Plaintiff an "exclusive distributor" of NovaRes in a defined territory. *Id.*, ¶ 2(a) (Defendant "appoints ISC as its exclusive distributor, of the Products in the Market only and in the Territory only").

Defendant argues that Plaintiff's fraud claim fails because the contract, which contains a merger clause, specifically allows Defendant to independently contact potential purchasers. Defendant further asserts that Plaintiff cannot show justifiable reliance on any statements that may have been made during negotiations about not soliciting customers because of the merger clause contained in the Agreement. Plaintiff responds that the merger clause does not preclude a claim of fraud where the misrepresentation is contained in the agreement itself. Plaintiff avers that Defendant never intended to have Plaintiff be an "exclusive distributor" as described in Paragraph 4(c) of the Agreement.

The tort of fraud has five elements: (1) false representation, (2) scienter, (3) intention to induce the plaintiff to act or to refrain from acting, (4) justifiable reliance, and (5) damages. *See*, *e.g.*, *Markowitz v. Wieland*, 243 Ga. App. 151, 153 (2000). Georgia law provides as "a matter of law, a valid merger clause executed by two or more parties in an arm's length transaction precludes any subsequent claim of deceit based upon pre-

contractual representations." *See First Data POS, Inc. v. Willis*, 273 Ga. 792, 795 (2001).

The Supreme Court of Georgia further explained:

> Where a conflict exists between oral and written representations, it has long been the law in Georgia that if the parties have reduced their agreement to writing, all oral representations made antecedent to execution of the written contract are merged into and extinguished by the contract and are not binding upon the parties. In written contracts containing a merger clause, prior or contemporaneous representations that contradict the written contract "cannot be used to vary the terms of a valid written agreement purporting to contain the entire agreement of the parties, nor would the violation of any such alleged oral agreement amount to actionable fraud."

*Id.* at 794-95 (citations omitted).

The court finds Plaintiff's fraud claim without merit. Plaintiff's attempt to make an end-run around the merger clause is unavailing. Paragraph 4(c) of the Agreement clearly states the parties' understanding that Defendant would be permitted to contact potential customers. Plaintiff argues in its response brief that "[s]tatus as the 'exclusive distributor' was important to ISC and induced it to enter into the Agreement because it believed that it alone would be marketing the NovaRes to the beverage and flavor industry." *See* Response, at 18-19. Even assuming arguendo that Defendant made independent sales calls, Plaintiff's argument fails in light of the direct language in the contract which permits Defendant to call on customers. Because the parties directly addressed this issue and set forth the agreed-upon parameters in the contract, Plaintiff's fraud claim fails.

27

### E.    Lanham Act

Plaintiff alleges that Defendant's post-termination distribution of bags of NovaRes containing Plaintiff's name and logo violates the Lanham Act because there can be no clearer demonstration of trademark infringement than unauthorized use of a mark. Defendant argues that Plaintiff has not been able to demonstrate any evidence of confusion due to the admitted use.  Defendant avers that Plaintiff's mark is weak and the circumstances of the sales preclude customer confusion.  The customers had contacted Defendant directly to discuss sales and the buyers were sophisticated manufacturers who purchased an average of $12,000 worth of product.  The bags were shipped to customers in boxes bearing Defendant's logo, although the fifty-pound bags of product within the boxes did contain a smaller version of Plaintiff's logo.  Of the seven customers who received the total of seventeen shipments of product in bags containing Plaintiff's logo, each was notified directly by Defendant that Defendant had terminated Plaintiff's distributorship agreement.

Because this is not a typical circumstance of two similar but competing marks, the court finds *Custom Manufacturing & Engineering, Inc. v. Midway Services, Inc.*, 508 F.3d 641 (11th Cir. 2007), to be instructive.  There, Midway wanted to "market a system that could remotely read the water meters installed in each unit of multiple-unit residential complexes such as apartment buildings." *Id.* at 645.  Midway contracted with Custom to design and manufacture such a system.  Custom did so and after some systems were installed

and did not work as hoped, the parties sued one another for breach of contract. Midway then

hired several other engineers to rework the system. Those new contractors used numerous

parts from the original system, including a circuit board with a legend containing Custom's

logo. During the breach of contract litigation, Custom learned that boards with its logo were

being used by Midway and sued under the Lanham Act.

> The Eleventh Circuit stated:
>
> Section 43(a) of the Lanham Act creates a federal cause of action for unfair
> competition in interstate commerce, and forbids unfair trade practices
> involving infringement of . . . trademarks, even in the absence of federal
> trademark registration. . . . Unlike the general prohibition against
> unauthorized copying that exists in patent and copyright law, the touchstone
> of liability in a trademark infringement action is not simply whether there is
> unauthorized use of a protected mark, but whether such use is likely to cause
> consumer confusion.

*Id.* at 647 (quotations and citations omitted).

The court then reviewed the general provisions of trademark protection. Plaintiff

must prove both that it had rights in its mark and that Defendant's mark is likely to cause

confusion. *Frehling Enters., Inc. v. International Select Group, Inc.*, 192 F.3d 1330, 1335

(11th Cir. 1999). The Eleventh Circuit applies a seven-factor test for determining whether

a likelihood of consumer confusion exists: (1) type of mark, (2) similarity of mark, (3)

similarity of products or services the marks represent, (4) similarity of the parties' retail

outlets and customers, (5) similarity of advertising media, (6) defendant's intent, and (7)

actual confusion. *Id.* at 1335. A court should not engage in a "mechanistic summation" of

the factors.  *See Custom Manufacturing*, 508 F.3d at 649.  The type of mark and the evidence of actual confusion are to be given the most weight.  *Id.* at 650.  "[W]hile these seven subsidiary findings typically inform a court's determination of the likelihood of confusion, a court must also take into account the unique facts of each case."  *Id.*

In *Custom Manufacturing*, the court recognized that it was not a "paradigmatic 'passing off' case."  *Id.*  "The goods on which Custom's mark was affixed were subcomponents manufactured for use in a product that was marketed to apartment complex owners and managers, not to Custom's customers."  *Id.*  The "question in this case involves the likelihood of confusion in the post-sale context – namely, whether Custom's or Midway's potential customers are likely to be confused as to the origin of the extant circuit boards."  *Id.*  Because of the placement of the circuit boards behind opaque plastic housing units placed in the attic or roof and other high exterior walls of buildings, the court determined that the relevant purchasing public would not be confused.  *Id.* at 650-51 (noting that Lanham Act requires that confusion not just be "possible" but "likely").  "Like the proverbial tree falling in a forest, the unauthorized use of a trademark that is never perceived by anyone cannot be said to create a likelihood of consumer confusion."  *Id.* at 652.

Here, no party has addressed whether Plaintiff has any protectable rights in its mark or logo, so the court presumes for the purposes of Defendant's motion that Plaintiff does possess such rights.  While some of the seven factors are not useful for a determination of

AO 72A
(Rev.8/82)

the potential for confusion in the instant circumstances, the court finds the nature of the sale and the parties' relationship to be significant. There were only seven customers affected by the marked bags. Plaintiff has presented no evidence that these customers were actually or potentially confused by the situation. Furthermore, the fact that these customers directly contacted Defendant and knew through either letter or personal contact that the Agreement between Plaintiff and Defendant had been terminated also counsels against a finding of confusion. Finally, Plaintiff and Defendant are not competitors in the industry. Defendant's shipment of NovaRes in bags containing Plaintiff's logo on the back bottom of the bag did not divert sales from Plaintiff. Plaintiff was a distributor who had been terminated.

The court recognizes that a plaintiff is not required to demonstrate actual confusion to sustain a claim under the Lanham Act. *See E. Remy Martin & Co. v. Shaw-Ross International Importers, Inc.*, 756 F.2d 1525, 1529 (11th Cir. 1985) ("The law is well settled in this circuit that evidence of *actual* confusion . . . is not necessary to a finding of *likelihood* of confusion.") (emphasis in original). Here, however, Plaintiff has proffered no evidence to demonstrate that any confusion was likely under the unusual circumstances of sale. For these reasons, the court GRANTS Defendant's motion for summary judgment as to Plaintiff's Lanham Act claims.

AO 72A
(Rev.8/82)

### III.    Conclusion

The court GRANTS Defendant's motion for summary judgment [56]; GRANTS Defendant's motion for leave to file excess pages [82]; and GRANTS Plaintiff's motion to strike [86].

The instant order resolves Plaintiff's complaint, but leaves outstanding Defendant's counterclaims.  The court DIRECTS the parties to file a Pre-Trial Order within thirty (30) days of the date of that order.

**IT IS SO ORDERED** this 24th day of August 2009.

_____/s J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)